1  Aram Ordubegian (SBN 185142)
   Andy S. Kong (SBN 243933)
2  M. Douglas Flahaut (SBN 245558)
   **ARENT FOX LLP**
3  555 West Fifth Street, 48th Floor
   Los Angeles, CA  90013-1065
4  Telephone:   213.629.7400
   Facsimile:    213.629.7401
5
   *Proposed* General Bankruptcy and Restructuring
6  Attorneys for Debtor and Debtor-in-Possession

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10                    **OAKLAND DIVISION**

11

12 In re:                              Case No.  4:10-bk-48268-RJN

13 **Hi-Five Enterprises, LLC**, a      Chapter 11
   California limited liability company,
14                                      **EMERGENCY MOTION OF DEBTORS**
                Debtor and Debtor-In-   **FOR AUTHORITY TO USE CASH**
15              Possession.             **COLLATERAL ON AN INTERIM**
                                        **BASIS PENDING A FINAL HEARING;**
16                                      **MEMORANDUM OF POINTS AND**
                                        **AUTHORITIES IN SUPPORT**
17                                      **THEREOF**

18                                      <u>**Hearing**</u>

19                                      DATE:     [TO BE SET]

20                                      TIME:     [TO BE SET]

21                                      PLACE:    Courtroom 202
                                                  1300 Clay Street
22                                                Oakland, CA 94612

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion                    CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 1 of 27

# TABLE OF CONTENTS

**Page**

I.  GENERAL CASE BACKGROUND ............................................................... 6
    A.  The Debtors' Business Operations ......................................... 6
        1.  One South ................................................................... 6
        2.  Wild Game .................................................................. 6
        3.  Hi-Five ....................................................................... 8
    B.  The Recession and Events Leading to These Chapter 11 Filings ..... 8
        1.  The Debtors' Historical Operating Losses ....................... 8
        2.  The Debtor's Turnaround Effort ................................... 9
        3.  The Debtors' Past-Due Taxes and Minimum Bankroll ........ 10
        4.  The Debtors' Operations in Chapter 11 ......................... 11
    C.  The Debtors' Assets ......................................................... 11
    D.  The Debtors' Liabilities and Its Secured Creditors ................... 12
    E.  The Debtors' Immediate Need for Use of Cash Collateral
        to Avoid Immediate and Irreparable Harm to the Debtors'
        Business ....................................................................... 13

II. LEGAL ARGUMENT .......................................................................... 14
    1.  The Debtors Should Be Authorized To Use Cash Collateral To
        Operate, Maintain, And Preserve Their Business .......................... 14
    2.  Lender and the Equipment Lessors Are Adequately Protected ....... 15

III. CONCLUSION .............................................................................. 17

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 2 of 27

# **TABLE OF AUTHORITIES**

Page(s)

CASES

*In re Dynaco Corporation,*
  *162 B.R. 389 (Bankr. D.N.H. 1993)* ................................................................. 15, 17

*In re Immenhausen Corp.,*
  164 B.R. 347 (Bankr. M.D. Fla. 1994) ................................................................. 17

*In re McCombs Properties VI, Ltd.,*
  88 B.R. 261 (Bankr. C.D. Cal. 1988) ................................................................. 15, 16

*In re Mellor,*
  734 F.2d 1396 (9th Cir. 1984) ................................................................. 15

*In re Newark Airport/Hotel Ltd. Partnership,*
  156 B.R. 444 (Bankr. D.N.J. 1993) ................................................................. 17

*In re O'Connor,*
  808 F.2d 1393 (10th Cir. 1987) ................................................................. 15

*In re Oak Glen R-Vee,*
  8 B.R. 213 (Bankr. C.D. Cal. 1981) ................................................................. 15

*In re Pursuit Athletic Footwear, Inc.,*
  193 B.R. 713 (Bankr. D. Del. 1996) ................................................................. 17

*In re Stein,*
  19 B.R. 458 (Bankr. E.D. PA 1982) ................................................................. 15, 16

*In re Tucson Industrial Partners,*
  129 B.R. 614 (9th Cir. BAP 1991) ................................................................. 15

*United Savings Association v. Timbers of Inwood Forest Associates,*
  108 S.Ct. 626 (1988) ................................................................. 15

STATUTES

11 U.S.C. § 361 ................................................................. 17

11 U.S.C. § 363 ................................................................. 14

11 U.S.C. § 363(a) ................................................................. 14, 15

11 U.S.C. § 363(c)(1) ................................................................. 14, 15

11 U.S.C. §363(c)(2) ................................................................. 14, 15

11 U.S.C. § 363(c)(2)(A) and (B) ................................................................. 14

11 U.S.C. § 363(c)(2)(B) ................................................................. 15

11 U.S.C. §363(e) ................................................................. 14

11 U.S.C. §1107(a) ................................................................. 11, 14

11 U.S.C. § 1108 ................................................................. 11

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion                    - ii -                    CASE NO. 4:10-BK-48268-RJN
LA/303647.1

Case: 10-48268     Doc# 9     Filed: 07/26/10     Entered: 07/26/10 18:29:00     Page 3 of 27

1     Hi-Five Enterprises, LLC ("Hi-Five") hereby files this Emergency Motion seeking

2 authority to use cash collateral to pay its ordinary and necessary operating expenses in

3 accordance with the budget (the "Budget") attached hereto as Exhibit "A." One South

4 Lake Street, LLC ("One South") and Wild Game Ng, LLC, d/b/a The Siena Hotel Spa &

5 Casino ("Wild Game), will file joinders to this Emergency Motion. As set forth in the

6 annexed Memorandum of Points and Authorities, Hi-Five, One South, and Wild Game

7 (collectively, the "Debtors") believe that their cash assets may not be subject to any valid,

8 perfected, and unavoidable liens, or to the extent that such liens exist, they are limited in

9 nature. Nevertheless, the Debtors have filed this Emergency Motion out of an abundance

10 of caution and because it is essential, to avoid immediate and irreparable harm to their

11 business operations, their estates, and their creditors, that the Debtors have undisrupted

12 access to their cash to pay their ordinary business expenses. Furthermore, the Debtors

13 expect to file a stipulation with the one creditor (R.E. Reno, LLC and defined as Lender,

14 below) that may conceivably have a lien on the cash of the businesses prior to the hearing

15 on this Emergency Motion.

16     This Emergency Motion is based on Bankruptcy Local Rules 9006-1, 9029-1, and

17 11 U.S.C. § 363, the annexed Memorandum of Points and Authorities, the accompanying

18 Omnibus Declaration of Barney Ng (the "Ng Declaration"), the arguments and statements

19 of counsel to be made at the hearing on the Emergency Motion, and all other admissible

20 evidence properly brought before the Court. The Debtors reserve the right to supplement

21 this Emergency Motion up until, or at, the hearing on this Emergency Motion.

22 **I.**

23 **INTRODUCTORY STATEMENT**

24     As noted above, it appears there may be no party with a valid, perfected, and

25 unavoidable lien in the Debtors' cash assets. Hi-Five has no known secured creditors. In

26 or about August 2001, One South, which owns the real property The Siena Hotel Spa &

27 Casino ("The Siena"), entered into a $50 million acquisition and development loan with

28 R.E. Reno, LLC (the "Lender"), together with a *Deed of Trust, Security Agreement,*

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion      - 2 -      CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 4 of 27

*Assignment of Leases and Rents and Fixture Filing* (the "Deed of Trust") granting to the Lender a security interest in the property and certain other assets of One South. The Debtors have conducted a UCC search, and it appears that the Lender has filed a UCC-1 financing statement only with respect to One South. Moreover, based on the Debtors' discussions with the Lender, it appears that the Lender may not assert at this time that its UCC-1 financing statement extends to the assets of Wild Game which operates the Debtors' businesses and generates cash assets. One South's cash assets are *de minimis*, and the Budget proposed by the Debtors does not contemplate any expenditure of One South's cash. As previously noted, based upon a discussion with the Lender's counsel in the afternoon of July 26, 2010, the Debtors expect the Lender to stipulate to the usage of cash collateral, limited by certain conditions and reservations of rights. As such, this Emergency Motion is filed to protect the Debtors' estates in the unlikely event a stipulated resolution is not completed forthwith.

Finally, Wild Game, which operates The Siena, is not a party to any loan agreement or credit facility that appears to encumber its cash assets. Eight entities (collectively, the "Equipment Lessors") have filed UCC-1 financing statements with respect to various gaming equipment and lighting fixtures located at The Siena: IGT, Konami Gaming, Inc., Raymond Leasing Corp., Young Electric Sign Company, PDS Gaming Corporation, PDS Gaming Corporation – Nevada, Bank of Wyoming, and PDS Funding 2004-A, LLC. The Debtors have not yet determined whether the underlying agreements with these parties are properly characterized as leases or financing agreements, but in any event, the security interests asserted appear to pertain to the Wild Game's leased equipment and not the cash generated by the Wild Game's operations. The Equipment Lessors will be provided notice of this Motion and any hearing thereto.

The Debtors believe that the Lender will consent to Wild Game's use of cash, in accordance with the Budget, to the extent that the Lender may have a lien in such cash. Furthermore, as demonstrated by the Debtors' Budget and as discussed below, to the extent that the Lender or the Equipment Lessors may have a lien in any of Wild Game's

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion          - 3 -          CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268     Doc# 9     Filed: 07/26/10     Entered: 07/26/10 18:29:00     Page 5 of 27

cash assets, these parties are adequately protected by the Debtors' continuing business operations.

It is imperative that the Debtors obtain immediate Court authority to use their cash, to the extent that such cash may constitute cash collateral, in order to avoid immediate and irreparable harm to their business. An integral aspect of maintaining the Debtors' relationships, compliance with applicable gaming laws and regulations, and their business operations is the Debtors' ability to use their cash to maintain a sufficient level of working capital, to pay ordinary course obligations such as those to their employees, customer programs, vendors, and taxing authorities, to pay for necessary ordinary course property maintenance and projects, and to maintain minimum bankroll requirements as determined by the Nevada Gaming Commission. Accordingly this Emergency Motion seeks authority for the Debtors to use their cash in the ordinary course of business, to the extent such cash may constitute cash collateral, in accordance with the attached Budget (Exhibit "A"), and for the period covered by the Budget, *e.g.,* for the 12 week period following the commencement of these cases (the "Budget Period").

## II.

## <u>CERTIFICATION</u>

I have read this Emergency Motion and the Introductory Statement set forth above. Because this is neither a stipulation nor an uncontested motion, I do not believe the Court's *Guidelines for Cash Collateral and Financing Motions* are applicable. Nevertheless, to the extent applicable, to the best of my knowledge, information, and belief, formed after reasonable inquiry, the terms of the relief sought in this Emergency Motion are in conformity with the Court's *Guidelines for Cash Collateral and Financing Motions*. I understand, and have advised the Debtors, that the Court may grant appropriate relief under Rule 9024 of the Federal Rules of Bankruptcy Procedure if the Court determines that the material elements of this Emergency Motion were not

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion          - 4 -          CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268     Doc# 9     Filed: 07/26/10     Entered: 07/26/10 18:29:00     Page 6 of 27

adequately disclosed in the Introductory Statement. Once a stipulation is filed a new certification will be submitted.

Dated: July 26, 2010

**ARENT FOX LLP**

By: */s/ Aram Ordubegian*
Aram Ordubegian
Andy S. Kong
*Proposed* Attorneys for the
Debtors and Debtors in Possession

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## GENERAL CASE BACKGROUND

The debtors and debtors-in-possession in these related bankruptcy cases (collectively, the "Cases") are Hi-Five, One South, and Wild Game. The Debtors filed their respective bankruptcy cases on July 22, 2010 (the "Petition Date").

**A.** **The Debtors' Business Operations.**

 **1.** **One South**

One South was formed for the purpose of owning and leasing The Siena, as well as the adjacent parking lot property and an expansion property (collectively, the "Property"). The Property is leased to Wild Game. Hi-Five holds a 25% equity interest in One South.

In connection with the acquisition of the Property, on or about August 22, 2001, One South and the Lender entered into a *Promissory Note Secured by Deed of Trust* (the "Acquisition Loan") in the principal amount of $50 million, thereby consolidating a number of prior loans that the Debtors had entered into with the Lender. The Acquisition Loan was originally due and payable on January 1, 2007; however, One South obtained a five-year extension of the original maturity date. The Acquisition Loan is secured by a security interest in the Property pursuant to the Deed of Trust, which was recorded on December 17, 2001, under instrument number 2629346, in the office of the County Recorder of Washoe County, Nevada (the "Security Agreement"). A UCC-1 affecting only the Property only may have been recorded as well.

 **2.** **Wild Game**

Wild Game operates The Siena Hotel Spa & Casino ("Siena") located in Reno, Nevada which opened on July 31, 2001. The Siena is a boutique hotel featuring 185 rooms and 29 suites that range in size up to 1,200 square feet. The Siena also has convention facilities, meeting and banquet space, various bars and restaurants, and an on-site spa. The casino is 23,000 square feet and boasts all the latest equipment of a modern-day gaming complex. The casino owns approximately 243 slot machines, 28 gaming

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion   - 6 -   CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268   Doc# 9   Filed: 07/26/10   Entered: 07/26/10 18:29:00   Page 8 of 27

tables, a poker room, and a race and sports book. The Siena is one of the only boutique hotel spa and casinos in Reno, and therefore it is not in direct competition with any other Reno properties.

The Siena's spa is an important feature that attracts both local customers and guests of the resort and adjacent resorts. The spa boasts eleven therapy rooms offering a number of treatments and a mediation center. The spa is integrated into the adjacent pool and outdoor recreation area, which also provides food and beverage services to its guests.

The Siena's casino marketing is directed at both the mid-level stakes gaming customers (*e.g.,* customers who wager less than industry averages) and high-stakes customers (*e.g.,* customers who wager more than industry averages). As the gaming market in Reno has declined, a greater focus has been placed on mid-level stakes gaming customers, because these customers tend to be consistent players who provide the Debtors with a steady gaming revenue stream. This revenue is the base line for non-convention, non-tourism, and non-weekend traffic. Marketing and promotions to the mid-level stakes customer base are intended to drive consistent traffic on "off" days. The Siena also has the ability to offer table games designed for the mid-level stakes market, to implement stricter credit policies appropriate for this market, and to emphasize slot machine play attractive to mid-level players. The Siena's strategy is to continue to invest in its slot machines and table game products, to market to its customer base primarily through a multi-tiered players' club program called the River Card loyalty program, and to offer slot machine and poker tournaments and other special events and promotions.

The Debtors are focusing capital expenditures for The Siena toward maintaining its hotel rooms and amenities in pristine condition to compete for customers with the other hotels and casinos in Reno, Nevada. Room rental rates, slot revenues, and the use of the convention and banquet spaces are the primary factors driving operating margins. The Debtors also use various technologies to maintain labor costs at a reasonable level, including kiosks for hotel check-in, slot club activities, and slot ticket redemption.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion        - 7 -        CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 9 of 27

1    Gaming is the single area where a modification of win per unit does not require a

2    modification of the cost of operations and payroll.

3        **3.    Hi-Five**

4        Hi-Five was originally created to allow investors that were interested in investing

5    in the acquisition of The Siena to use it as such an investment vehicle. Hi-Five has a 25%

6    membership interest in One South, and it therefore is an affiliate of One South and has an

7    interest in the Property. Hi-Five is located in this District and has become the "nerve

8    center" for the Debtors' business. Furthermore, the insiders of the Debtors, the Lender,

9    and what appears to be a majority of unsecured creditors and interested parties either live

10   or do business in this District.

11   **B.    The Recession and Events Leading to These Chapter 11 Filings.**

12       Although The Siena has historically not been a profitable business, in recent

13   months it commenced a restructuring effort that has produced significant positive results.

14   The Debtors' Chapter 11 filings are designed to further these positive results and to

15   facilitate a comprehensive restructuring and reorganization for the Debtors.

16       **1.    The Debtors' Historical Operating Losses**

17       For the first 8 years, the Debtors' sole managing member personally loaned Wild

18   Game the money needed to pay rent obligations to One South, which rent payments

19   provide the revenue needed to make payments on account of the Acquisition Loan.

20   Furthermore, Indian gaming in Sacramento, California, which began in or about June

21   2004, had an almost overnight effect on The Siena. There was, and continues to be, a

22   sudden drop in tourism, the cancellation of major conventions and festivals, and the

23   cancellation of numerous corporate seminars and events. And the overall economic

24   recession has particularly effected Reno, Nevada given its reliance on tourism and

25   construction.

26       These factors have all attributed to a serious decline in the Debtors' revenue in

27   2008 and 2009. The Debtors' total gross annual revenue in 2006 was $26,358,958.78 and

28   increased in 2007 to $26,507,984.30. However, commencing in 2008, the Debtors' total

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion          - 8 -          CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 10 of 27

gross annual revenue began to sharply decline to $22,587,090.67 in 2008 and to $18,579,278.75 in 2009. The Debtors incurred total net annual *losses* of $4,385,569.63 in 2006, $6,051,976.09 in 2007, $6,661,108.05 in 2008, and $6,699,065.01 in 2009. More specifically, the Debtors' casino revenues in 2009 were $9.5 million, a decrease of $2.1 million from 2008. Casino revenues are comprised primarily of slot machine and table game revenues. Slot machine and table game revenues decreased primarily due to less wagering as a result of the slower economy, reduced hotel occupancy, and less walk-in business. The Siena's room revenue in 2009 was $3.4 million, a decrease of $800,000 from 2008. Its revenues through the second quarter of 2010 were $1.7 million, a decrease of about $900,000 from the same time last period 2009.

The Debtors were unable to meet their obligations under the Acquisition Loan and accordingly, the Lender filed a notice of default on December 11, 2009, thereby exacerbating Siena's difficulties. A notice of trustee's sale was never recorded.

**2. The Debtor's Turnaround Effort**

In November of 2009, the Debtors started inquiring into a number of companies who focused on turnaround, workout, and other insolvency positioning to help restructure the Debtors. In December 2009, the Debtors contracted with OnSite Consulting, Inc. ("OnSite"), a hotel management and consulting firm, to undertake a concurrent audit and restructuring of The Siena and determine an appropriate repositioning strategy. OnSite recommended, and the Debtors made, significant operational changes to the customer marketing program and third party hotel booking systems (*i.e.,* Expedia, etc.) that resulted in the Debtors achieving an overall revenue that is now one of the highest in Reno. With this restructuring, the hotel, food and beverage, spa, and other add-value services, which once had been considered secondary to gaming, The Siena now enjoys revenues and margins that match, or in some instances, surpass gaming.

The Debtors have achieved significant positive results from this repositioning strategy. The Debtors closed a $600,000 contract with United Airlines flight staff union, and the Debtors now have a strong wedding base providing over $28,000 per event. The

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES
LA/303643.1

Siena is also seeing a consistent resurgence in sales. In all, while the top line volume has decreased, the Debtors' profit margins have increased and the Debtors firmly believe that an appropriate "right sizing" of the Debtors will allow them to achieve a positive cash flow shortly and will allow the Debtors to secure a new investor, operational, and financing sources for the benefit of creditors and equity holders.

### 3. The Debtors' Past-Due Taxes and Minimum Bankroll

While the Debtors' have made significant progress in their restructuring effort, they have run out of time, by a matter of mere days or weeks, for resolving certain delinquencies that have put their gaming license in jeopardy. The Debtors' Budget indicates that they will have the funds needed to cure these delinquencies.

The Nevada Gaming Commission (the "Gaming Commission") requires all gaming establishments in Nevada to maintain a "minimum bankroll," which is an amount that must be kept liquid at all times based upon a formula driven by current cash on hand and cash going forward. The minimum bankroll requirement is generally determined on a yearly basis. In addition, gaming taxes are paid in advance based on such forecasts. With the drastic, industry-wide drop in gaming and resort revenue discussed above, and with cashflow remaining tight, The Siena has had difficulty maintaining its minimum bankroll over an extended period of time.

Upon the Debtors' request, the Gaming Commission provided a modification of The Siena's minimum bankroll requirement, but even with this modification, the competitive pressures associated with Indian gaming in Sacramento, California, the global recession and decline in gaming and tourism, and The Siena's fixed operating costs have led the Debtors to fail to meet their minimum bankroll requirements on multiple occasions towards the end of 2009 and in the first quarter of 2010. Additionally, during this period the Debtors have been directing resources to settling historic debt accumulation, which in turn has caused delinquencies in the Debtors' tax prepayments. This triggered investigations, audits, and the filing of a complaint by the Gaming Commission. As a result of the complaint, a hearing was called by the Gaming Commission to determine if

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion     - 10 -     CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 12 of 27

the Debtors' gaming license would be deemed surrendered by operation of statute on account of the delinquencies in the payment of the Debtors' gaming taxes. The Gaming Commission also evaluated the Debtors' ability to manage its day-to-day obligations, including trade payables, labor costs, and obligations to gaming customers. At the conclusion of the hearing, the Gaming Commission suspended Wild Game's license, but it stayed enforcement for 30 days in order to allow the Debtors an opportunity to bring their tax payments current and to address their other operational issues.

During this 30-day period, the Debtors explored numerous options and secured a term sheet proposal for potential DIP financing. However, it became apparent that the Debtors would not be able to weather the continuing economic recession and address their outstanding current liabilities without strengthening their financial capital position and taking appropriate measures afforded under Chapter 11 of the Bankruptcy Code. Accordingly, the Debtors commenced these cases on July 21, 2010. At the Gaming Commission's follow-up hearing on July 22, 2010, the Gaming Commission turned this matter over to the Nevada Attorney General to oversee and ensure the Debtors' continued gaming compliance. It remains the case that, upon payment of the delinquent gaming taxes in the amount of approximately $193,000 (which delinquencies were the original cause for the complaint by the Gaming Commission), Wild Game's license will be permanently reinstated.

### 4. The Debtors' Operations in Chapter 11

The Debtors are continuing to operate their business and manage their affairs as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. The Debtors' management team, its legal advisors, and its financial advisors are working rapidly to prepare a reorganization plan that will enable the company to emerge from Chapter 11 as a strong, recapitalized, and profitable business.

### C. The Debtors' Assets.

Based on the Debtors' books and records, as of December 31, 2009, the Debtors' unaudited balance-sheet assets totaled approximately $5.08 million. Of this amount, the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion          - 11 -          CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 13 of 27

1 Debtors held, on a book value basis, approximately $322,674 in net inventories; fixed

2 assets (including property and equipment) of $2,207,940, net of depreciation; $453,000 in

3 net accounts receivable; $2,062,941in cash; and other assets totaling approximately

4 $40,000.  While the Debtors have not yet closed their books for July 2010, the Debtors

5 estimate that the total assets as of that date, and July 21, 2010 (the "Petition Date"), will

6 be approximately $3.8 million (not accounting for valuable litigation rights).

7 **D.     The Debtors' Liabilities and Its Secured Creditors.**

8          Based on its books and records, as of June 30, 2010, the Debtors' unaudited,

9 balance-sheet liabilities totaled approximately $20.7 million.  This amount includes

10 approximately $7.6 million in trade debts; $196,000 in taxes; $12.5 million in accrued

11 expenses and other current liabilities.  Although the Debtors have not yet closed their

12 books for July 2010, they estimate that the total liabilities as of that date, and the Petition

13 Date, will be approximately $23.3 million.  Some of the Debtors' more significant

14 liabilities are described in more detail, herein.  Naturally, the Debtors' bankruptcy

15 schedules and statement of financial affairs will have a more detailed and itemized list of

16 assets and liabilities.

17          As is set forth above, Hi-Five was created as an investment vehicle for parties that

18 were interested in participating in the acquisition of The Siena.  Hi-Five is unaware of any

19 parties that assert liens against that company's assets.

20          One South, in turn, owns The Siena.  In connection with the acquisition of the

21 Property, on or about August 22, 2001, One South entered into the Acquisition Loan with

22 the Lender, as well as the accompanying Security Agreement granting to the Lender a

23 security interest in substantially all of One South's assets.  The Debtors are unaware of

24 any other parties that assert security interests in the Property.

25          The Siena is operated by Wild Game.  As noted in the Introductory Statement, the

26 Equipment Lessors are the only parties that the Debtors are aware of who assert a security

27 interest in Wild Game's assets, and many of the underlying agreements may constitute

28 lease agreements rather than financing agreements.  Consistent with that premise, four of

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

these UCC financing statements do not indicate what, if anything, the purported secured parties assert a security interest in. A fifth asserts a lien in "all equipment and proceeds," and only the sixth asserts a lien in "accounts including proceeds… chattel paper including proceeds… lease equipment including proceeds… and leased fixtures including proceeds."

**E.** **The Debtors' Immediate Need for Use of Cash Collateral to Avoid Immediate and Irreparable Harm to the Debtors' Business.**

The Debtors have an emergency need for use of the Cash Collateral in accordance with the Budget attached hereto as Exhibit "A" and request Court authorization on an emergency interim basis for such use in order to avert an immediate closure of its businesses. The Budget was formulated after review of the Debtors' normal and ordinary course cash needs in the operation of its businesses. The usage of Cash Collateral is in the best interests of the Debtors and their estates.

The Debtors believe that the enterprise value of the Debtors' businesses will not diminish provided the Debtors' businesses continue to operate in the ordinary course, the Debtors are permitted to make the reasonable expenditures as proposed in the Budget and all gaming licenses and permits and present management remain in place.

An integral aspect of maintaining the Debtors' relationships, compliance with applicable gaming laws and regulations, and their business operations is the Debtors' ability to use the Cash Collateral to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to their employees, customer programs, vendors, and taxing authorities, to pay for necessary ordinary course property maintenance and projects and to maintain minimum bankroll requirements as determined by the Gaming Commission.

The Debtors have discussed their Chapter 11 filing with Lender, and they believe that they will ultimately be able to reach a consensual agreement with Lender with respect to the use of cash collateral—to the extent that Lender may have a valid, perfected security interest in the Debtors' cash—or alternatively, that Lender may have no objection

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion     - 13 -     CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 15 of 27

to this Emergency Motion, given the emergency nature of these filings there was not sufficient time for the parties to negotiate a cash collateral stipulation.

## II.

## LEGAL ARGUMENT

A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.[1] The Debtor's use of such estate property is generally governed by Section 363 of the Bankruptcy Code, which provides in pertinent part:

> "If the business of the debtor is authorized to be operated under section ... 1108 ... of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."[2]

Section 363(c)(2) goes on to establish a special requirement with respect to "cash collateral,"[3] providing that the trustee or debtor in possession may use cash collateral under subsection (c)(1) if: "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section."[4] Further, upon the request of an entity that has an interest in property proposed to be used by a debtor, the court shall prohibit or condition such use "as is necessary to provide adequate protection of such interest."[5]

1. **The Debtors Should Be Authorized To Use Cash Collateral To Operate, Maintain, And Preserve Their Business.**

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral

---

[1] *See* 11 U.S.C. §1107(a).

[2] 11 U.S.C. § 363(c)(1).

[3] Cash collateral is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest . . . " 11 U.S.C. § 363(a).

[4] 11 U.S.C. § 363(c)(2)(A) and (B).

[5] 11 U.S.C. §363(e).

Case: 10-48268     Doc# 9     Filed: 07/26/10     Entered: 07/26/10 18:29:00     Page 16 of 27

1   for a reasonable period of time for the purpose of maintaining and operating its property.[6]

2   The Debtors have determined that it would overwhelmingly be in the best interests of their

3   estates and creditors, suppliers, and employees to continue to operate and maintain their

4   business as a going concern. And as noted above, the Court should authorize the Debtors

5   to use cash collateral to continue to operate and maintain their business because the

6   interests of the Lender and the Equipment Lessors in cash collateral, if any, will be

7   adequately protected by the going concern value of the businesses.

8         2.   **Lender and the Equipment Lessors Are Adequately Protected.**

9       To the extent that an entity has a valid security interest in the revenues generated

10   by property, those revenues constitute "cash collateral" under Section 363(a) of the

11   Bankruptcy Code. Pursuant to Section 363(c)(2), the Court may authorize the debtor to

12   use a secured creditor's cash collateral if the secured creditor is adequately protected.[7]

13   Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood*

14   *Forest Associates* and subsequent case law, the property interest that a debtor must

15   adequately protect pursuant to Section 363(c)(1) and (2) of the Bankruptcy Code is only

16   the value of the lien that secures the creditor's claim.[8]

17       As set forth above, with respect to One South, that entity generates no cash other

18   than income provided by Wild Game pursuant to its operating agreement with One South.

19   Wild Game's Budget projects that no such payments will be provided to One South during

20   the Budget Period, and One South will make no payments or otherwise use cash assets

21   pursuant to the Budget. As such, to the extent that the Lender may have a valid,

22

---

[6]   11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. BAP 1991). In addition, where the Debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), quoting *In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. PA 1982).

[7]   *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984); *see also In re O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*. 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).

[8]   *United Savings Association v. Timbers of Inwood Forest Associates*, 108 S.Ct. 626 (1988)*; see also McCombs*, at 266. Section 506(a) "limit[s] the secured status of a creditor (*i.e.*, the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral."

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Emergency Cash Collateral Motion    - 15 -        CASE NO. 4:10-BK-48268-RJN
LA/303643.1

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 17 of 27

1 perfected, unavoidable security interest in cash held by One South, this Emergency

2 Motion and the Budget do not contemplate that any such cash will be utilized by the

3 Debtors.

4    With respect to Wild Game, the Lender appears to have no security interest

5 whatsoever in that debtors' assets. The Debtors believe that the Equipment Lessors may

6 have security interests in certain of the Debtors' equipment and lighting fixtures, but with

7 certain limited exceptions, such interests do not appear to extend to the Debtors' cash.

8    The preservation of the value of a secured creditor's lien can be sufficient to

9 provide adequate protection to a secured creditor when a debtor seeks to use cash

10 collateral. In *Stein*, the Court found that, as a general rule, a debtor may use cash

11 collateral where such use would enhance or preserve the value of the collateral, and

12 allowed the debtor therein to use cash collateral even though the secured party had no

13 equity cushion for protection. The *Stein* Court determined that the use of cash collateral

14 was necessary to the continued operations of the debtor, and that the creditor's secured

15 position could only be enhanced by the continued operation of the debtor's business.

16 Similarly, in *In re McCombs,* the court determined that the debtor's use of cash collateral

17 for needed repairs, renovations, and operating expenses eliminated the risk of diminution

18 in the creditor's interest in the cash collateral and such use would more likely increase

19 cash collateral.

20    The Debtors has already reduced and will continue with its efforts to reduce further

21 its operating expenses as much as possible. Furthermore, the Debtors are also seeking to

22 obtain post-petition financing which will provide additional liquidity for the Debtors'

23 operation. In the case of *In re Pursuit Athletic Footwear, Inc.,*[9] the court, accepting the

24 debtor's argument that no additional adequate protection payments need be made, held as

25 follows:

26         if there is no actual diminution in the value of [the] collateral
            through the date of the hearing, and [Debtor] can operate
27         profitably post-petition, [creditor] is adequately protected for

28 _____

[9]   *In re Pursuit Athletic Footwear, Inc.,* 193 B.R. 713 (Bankr. D. Del. 1996).

the use of its cash collateral. 11 U.S.C. Section 361; In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen Corp., 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

The only way for the Debtors to maximize their going concern value and avoid a complete shut down of the Debtors' business, which would be absolutely decimating for the Debtors' creditors, customers and employees, is for the Debtors to continue to operate their business seamlessly.

## III.

## CONCLUSION

**WHEREFORE**, based upon all of the foregoing, the Debtors respectfully requests that the Court enter an order:

1.     Authorizing the Debtors to use cash collateral to pay all of the expenses set forth in the Budget;

2.     Scheduling a final hearing n the Debtors' cash collateral motion; and

3.     Granting such other and further relief as the Court deems just and proper under the circumstances of these cases.


Dated: July 26, 2010                              Respectfully submitted,

                                                  **ARENT FOX LLP**

                                                  By: */s/ Aram Ordubegian*
                                                  Aram Ordubegian
                                                  Andy S. Kong
                                                  *Proposed* Attorneys for the
                                                  Debtors and Debtors in Possession

Case: 10-48268    Doc# 9    Filed: 07/26/10    Entered: 07/26/10 18:29:00    Page 19 of 27

# EXHIBIT "A"

SIENA HOTEL SPA CASINO

| Assumptions | (1) Limited time to prepare break down of all check for approval (Draft 1) |
|---|---|
| | (2) Week-Month-Quarter-Year is using non GAAP (4 weeks to a month) |
| | (3) Estimates on COS are based solely on revenues (as a percentage) |

| MONTHLY/WEEKLY | YEAR | QUARTER | MONTH | WEEKLY | |
|---|---|---|---|---|---|
| NV ENERGY - ELECTRIC | 1,020,000.00 | 255,000.00 | 85,000.00 | 21,250.00 | Utility |
| NV ENERGY - GAS | 180,000.00 | 45,000.00 | 15,000.00 | 3,750.00 | Utility |
| NV ENERGY - LIGHTS | 4,800.00 | 1,200.00 | 400.00 | 100.00 | Utility |
| NV ENERGY - SINCLAIR LIGHTS | 1,008.00 | 252.00 | 84.00 | 21.00 | Utility |
| RSCVA - ROOM TAX | 600,000.00 | 150,000.00 | 50,000.00 | 12,500.00 | Tax |
| WASTE MANAGEMENT | 43,200.00 | 10,800.00 | 3,600.00 | 900.00 | Utility |
| WASTE MANAGEMENT - RIM SYSTEM | 3,000.00 | 750.00 | 250.00 | 62.50 | Utility |
| TMWA | 28,800.00 | 7,200.00 | 2,400.00 | 600.00 | Utility |
| FOOD | 504,000.00 | 126,000.00 | 42,000.00 | 10,500.00 | COS |
| PREMIUM INSURANCE | 276,000.00 | 69,000.00 | 23,000.00 | 5,750.00 | Insurance |
| BEST LIFE | 60,000.00 | 15,000.00 | 5,000.00 | 1,250.00 | Insurance |
| SPRINT | 43,200.00 | 10,800.00 | 3,600.00 | 900.00 | Utility |
| INTEGRA | 48,000.00 | 12,000.00 | 4,000.00 | 1,000.00 | Utility |
| FORD CREDIT | 17,400.00 | 4,350.00 | 1,450.00 | 362.50 | Operations |
| ALSCO | 60,000.00 | 15,000.00 | 5,000.00 | 1,250.00 | COS |
| CENTRAL CREDIT | 16,800.00 | 4,200.00 | 1,400.00 | 350.00 | Banking |
| CHARTER COMMUNICATIONS | 18,480.00 | 4,620.00 | 1,540.00 | 385.00 | Utility |
| HEALTH INSURANCE | 540,000.00 | 135,000.00 | 45,000.00 | 11,250.00 | Insurance |
| NV SELF INSURED - CHSI (WORKMAN'S COMP) | 63,600.00 | 15,900.00 | 5,300.00 | 1,325.00 | Insurance |
| RAY MORGAN | 41,758.32 | 10,439.58 | 3,479.86 | 869.97 | COS |
| LIQUOR | 528,000.00 | 132,000.00 | 44,000.00 | 11,000.00 | COS |
| COLONIAL INSURANCE | 14,400.00 | 3,600.00 | 1,200.00 | 300.00 | Insurance |
| FIRE EXTINGUISHER SERVICES | 24,000.00 | 6,000.00 | 2,000.00 | 500.00 | Utility |
| HIGH DESERT RECYCLING | 4,800.00 | 1,200.00 | 400.00 | 100.00 | Utility |
| JOHNSTONE SUPPLY | 18,000.00 | 4,500.00 | 1,500.00 | 375.00 | COS |
| MUZAK | 1,832.76 | 458.19 | 152.73 | 38.18 | Marketing |
| STATEWIDE PEST CONTROL | 5,280.00 | 1,320.00 | 440.00 | 110.00 | Utility |
| RAYMOND LEASING | 1,292.52 | 323.13 | 107.71 | 26.93 | Operations |
| RENO TAHOE AIRPORT AUTHORITY | 2,880.00 | 720.00 | 240.00 | 60.00 | Taxes |
| SMART & FINAL | 12,000.00 | 3,000.00 | 1,000.00 | 250.00 | COS |
| SHIFT 4 | 9,600.00 | 2,400.00 | 800.00 | 200.00 | Operations |
| SIERRA SPRINGS WATER | 3,600.00 | 900.00 | 300.00 | 75.00 | Utility |
| SYNXIS | 36,000.00 | 9,000.00 | 3,000.00 | 750.00 | COS |
| YESCO | 84,393.48 | 21,098.37 | 7,032.79 | 1,758.20 | COS |
| BUS & TRAVEL COMMISSIONS | 72,000.00 | 18,000.00 | 6,000.00 | 1,500.00 | Marketing |
| BALLY | 44,400.00 | 11,100.00 | 3,700.00 | 925.00 | Gaming |
| BALLY - PARTICIPATION | 74,400.00 | 18,600.00 | 6,200.00 | 1,550.00 | Gaming |
| ATRONIC - PARTICIPATION | 36,000.00 | 9,000.00 | 3,000.00 | 750.00 | Gaming |
| ARUZE - PARTICIPATION | 36,000.00 | 9,000.00 | 3,000.00 | 750.00 | Gaming |
| KONAMI | 468,462.60 | 117,115.65 | 39,038.55 | 9,759.64 | Gaming |
| KONAMI - PARTICIPATION | 54,000.00 | 13,500.00 | 4,500.00 | 1,125.00 | Gaming |
| CIT TECHNOLOGY | 9,600.00 | 2,400.00 | 800.00 | 200.00 | Gaming |
| GLORY | 4,800.00 | 1,200.00 | 400.00 | 100.00 | Gaming |
| TOTAL | 5115787.68 | 1278946.92 | 426315.64 | 106578.91 | |

| MONTHLY/WEEKLY APPROXIMATIONS | YEAR | QUARTER | MONTH | WEEKLY | |
|---|---|---|---|---|---|
| ENTERTAINMENT | 120,000.00 | 30,000.00 | 10,000.00 | 2,500.00 | Artists |
| SPA SUPPLIES | 72,000.00 | 18,000.00 | 6,000.00 | 1,500.00 | COS |
| ADVERTISING | 108,000.00 | 27,000.00 | 9,000.00 | 2,250.00 | Marketing |
| MARKETING | 120,000.00 | 30,000.00 | 10,000.00 | 2,500.00 | Marketing |
| GIFT SHOP | 84,000.00 | 21,000.00 | 7,000.00 | 1,750.00 | COS |
| LINENS | 72,000.00 | 18,000.00 | 6,000.00 | 1,500.00 | COS |

SIENA HOTEL SPA CASINO

| | | | | | |
|---|---|---|---|---|---|
| CHINA REPLACEMENT | 180,000.00 | 45,000.00 | 15,000.00 | 3,750.00 | COS |
| **TOTAL** | **756000.00** | **189000.00** | **63000.00** | **15750.00** | |

| BI-WEEKLY | YEAR | QUARTER | MONTH | WEEKLY | |
|---|---|---|---|---|---|
| PAYROLL | 4,344,000.00 | 1,086,000.00 | 362,000.00 | 90,500.00 | Payroll |
| PAYROLL TAXES | 1,320,000.00 | 330,000.00 | 110,000.00 | 27,500.00 | Payroll |
| COURTNEY BARNETT | 42,000.00 | 10,500.00 | 3,500.00 | 875.00 | Payroll |
| CERIDIAN | 28,800.00 | 7,200.00 | 2,400.00 | 600.00 | Payroll |
| **TOTAL** | **5734800.00** | **1433700.00** | **477900.00** | **119475.00** | |

| QUARTERLY | YEAR | QUARTER | MONTH | WEEKLY | |
|---|---|---|---|---|---|
| MICROS | 39,178.04 | 9,794.51 | 3,264.84 | 816.21 | Operations |
| CITY OF RENO - SEWER | 80,000.00 | 20,000.00 | 6,666.67 | 1,666.67 | Utility |
| CITY OF RENO - SEWER | 800.00 | 200.00 | 66.67 | 16.67 | Utility |
| CITY OF RENO - SEWER | 800.00 | 200.00 | 66.67 | 16.67 | Utility |
| CITY OF RENO - SEWER | 800.00 | 200.00 | 66.67 | 16.67 | Utility |
| CITY OF RENO - SEWER | 800.00 | 200.00 | 66.67 | 16.67 | Utility |
| OTIS ELEVATOR | 42,000.00 | 10,500.00 | 3,500.00 | 875.00 | Operations |
| WASHOE COUNTY HEALTH DEPARTMENT | 6,000.00 | 1,500.00 | 500.00 | 125.00 | Taxes |
| **TOTAL** | **170378.04** | **42594.51** | **14198.17** | **3549.54** | |

| SEMI-ANNUAL | YEAR | QUARTER | MONTH | WEEKLY | |
|---|---|---|---|---|---|
| EASY ROOTER | 60,000.00 | 15,000.00 | 5,000.00 | 1,250.00 | Operations |
| **TOTAL** | **60000.00** | **15000.00** | **5000.00** | **1250.00** | |

| YEARLY | YEAR | QUARTER | MONTH | WEEKLY | |
|---|---|---|---|---|---|
| SIBERT INSURANCE | 540,000.00 | 135,000.00 | 45,000.00 | 11,250.00 | Insurance |
| **TOTAL** | **540000.00** | **135000.00** | **45000.00** | **11250.00** | |

| TAXES | YEAR | QUARTER | MONTH | WEEKLY | |
|---|---|---|---|---|---|
| LIVE ENTERTAINMENT TAX | 18,000.00 | 4,500.00 | 1,500.00 | 375.00 | Taxes |
| CITY OF RENO QUARTERLY GAMING | 72,000.00 | 18,000.00 | 6,000.00 | 1,500.00 | Taxes |
| CITY OF RENO QUARTERLY BAR | | | | | |
| GAMING - NGC 15 | 16,000.00 | 4,000.00 | 1,333.33 | 333.33 | Taxes |
| GAMING - NGC 01 | 540,000.00 | 135,000.00 | 45,000.00 | 11,250.00 | Taxes |
| **TOTAL** | **646000.00** | **161500.00** | **53833.33** | **13458.33** | |

| **Professional Services** | YEAR | QUARTER | MONTH | WEEKLY | |
|---|---|---|---|---|---|
| KMC, Inc | | | 8,000.00 | 2,000.00 | |
| Arent Fox | | | 50,000.00 | 12,500.00 | |
| OnSite Consulting, Inc | | | 60,000.00 | 15,000.00 | |
| Kelly Law Group | | | 7,000.00 | 1,750.00 | |
| Lewis & Roca | | | 10,000.00 | 2,500.00 | |
| Elever Professional, Inc | | | 10,000.00 | 2,500.00 | |
| **TOTAL** | **0.00** | **0.00** | **145,000.00** | **36,250.00** | |

| Total | YEAR | QUARTER | MONTH | WEEKLY | |
|---|---|---|---|---|---|
| *All Planned Expenditures* | *13,022,965.72* | *3,255,741.43* | *1,230,247.14* | *307,561.79* | |
| *Less BK costs* | *13,022,965.72* | *3,255,741.43* | *1,085,247.14* | *271,311.79* | |
| *Less Participation Contracts* | *-12,778,165.72* | *-3,194,541.43* | *-1,064,847.14* | *-266,211.79* | |

| In re: **Hi-Five Enterprises, LLC** | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 4:10-bk-48268 |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: Arent Fox LLP, Gas Company Tower, 555 West Fifth Street, 48th Floor, Los Angeles, CA 90013.

A true and correct copy of the foregoing document described <u>EMERGENCY MOTION OF DEBTORS FOR AUTHORITY TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>July 26, 2010</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. <u>SERVED BY U.S. MAIL OR OVERNIGHT MAIL</u>**(indicate method for each person or entity served)**:**
On <u>July 26, 2010</u> I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**III. <u>SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL</u>** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 26, 2010 | SIMONA FILIP | /s/ Simona Filip |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

**ADDITIONAL SERVICE INFORMATION**

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF") :**

Office of the U.S. Trustee/Oak
USTPRegion17.OA.ECF@usdoj.gov, ltroxas@hotmail.com

**II. SERVED BY U.S. MAIL:**

U.S. TRUSTEE
Office of the U.S. Trustee/Oak
1301 Clay St. #690N
Oakland, CA 94612

20 LARGEST CREDITORS OF HI-FIVE ENTERPRISES, LLC:

Barney Ng
201 Lafayette Circle 2nd Fl
Lafayette, CA 94549-0000

20 LARGEST CREDITORS OF ONE SOUTH LAKE STREET, LLC:

RE Reno LLC
201 Lafayette Circle 2nd Fl
Lafayette, CA 94549

Attorneys for RE Reno LLC
Jeffrey C. Krause
Eve H. Karasik
Eric D. Goldberg
Stutman Treister & Glatt
1901 Ave of the Stars, 12 Fl
Los Angeles, CA 90067

20 LARGEST CREDITORS OF WILD GAME NG, LLC :

ARISTOCRAT/COFACE COLLECTION
PO Box 8510
Metairie, LA 70011-8510

ATRONIC AMERICAS LLC
PO Box 49008
San Jose, CA 95161

BAKEMARK
5455 Louie Lane
Reno, NV 89511

BALLY TECHNOLOGIES INC
Lockbox 749335
Los Angeles, CA 90074

BARNEY NG
201 Lafayette Circle 2nd Fl
Lafayette, CA 94549

CITY OF RENO
Business License Renewals
PO Box  7
Reno, NV 89505

COSTCO
2200 Harvard Way
Reno, NV 89502

DE LAGE LANDEN FINANCIAL SERV
REF NO 000000000379545
PO Box 41601
Philadelphia, PA 19101-1601

GRANT THORNTON LLP
PO Box 51552
Los Angeles, CA 90051-5852

IGT
9295 PROTOTYPE DR
ATTN Linda Rocconi-Credit Dpt
Reno, NV 89521

KONAMI GAMING INC
Lockbox Address
Dept 8401
Los Angeles, CA 90084-8401

LATHROP & GAGE LLP
1888 Century Park E., Ste 1000
Los Angeles, CA 90067

NV ENERGY
FINANCE - A/P
6226 W Sahara Ave Ms11
Las Vegas, NV 89151

PALTRONICS INC
1145 Paltronics Court
Crystal Lake, IL 60014

RENO-SPARKS CONV and VISITOR-WL
Finance Department
PO BOX 837
Reno, NV 89504-0837

SAM S CLUB/ GE MONEY BANK
13809 Research Blvd Suite 800
Austin, TX 78750

SPILLANE SHAEFFER ARONOFF and BANDLOW LLP
1888 Century Park E., Ste 1000
Los Angeles, CA 90067

SYSCO FOOD SERVICE OF SACRAMENTO
PO Box 138007
Sacramento, CA 95813

U1 GAMING
55 TIMBERLINE DRIVE
SUITE 6
Bozeman, MT 59718

WALTER NG
201 Lafayette Circle 2nd Fl
Lafayette, CA 94549

SECURED CREDITORS OF WILD GAME NG, LLC :

IGT
9295 PROTOTYPE DR
Reno, NV 89521

KONAMI GAMING, INC.
585 Trade Center Drive
Las Vegas, NV 89118

RAYMOND LEASING CORPORATION
P.O. Box 130
Greene, NY 13778

PDS GAMING CORPORATION-NEVADA
6280 Annie Oakley Drive
Las Vegas, NV 89120-391

WELLS FARGO BANK, NATIONAL ASSOCIATION
3800 Howard Hughes Parkway 4th Floor
Las Vegas, NV 89109

YOUNG ELECTRIC SIGN COMPANY
775 E Glendale Ave
Sparks, NV 89431

BANK WYOMING
435 Arapahoe
Thermopolis, WY 82443-1232