Aram Ordubegian (SBN 185142)
Andy S. Kong (SBN 243933)
M. Douglas Flahaut (SBN 245558)
**ARENT FOX LLP**
555 West Fifth Street, 48th Floor
Los Angeles, CA 90013-1065
Telephone:    213.629.7400
Facsimile:    213.629.7401
Email:        ordubegian.aram@arentfox.com
              kong.andy@arentfox.com
              flahaut.douglas@arentfox.com

*Proposed* General Bankruptcy and Restructuring Attorneys for Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>**Hi-Five Enterprises, LLC**, a California limited liability company,<br><br>　　　　Debtor and Debtor-in-Possession. | Case No. 4:10-bk-48268-RJN<br><br>Chapter 11<br><br>**OMNIBUS DECLARATION OF BARNEY NG IN SUPPORT OF DEBTORS AND DEBTORS-IN-POSSESSION'S "FIRST DAY MOTIONS"** |

I, Barney Ng, declare as follows:

1.     I am over 18 years of age. If called as a witness, I could and would competently testify with respect to the matters set forth in this declaration from my own personal knowledge or from knowledge gathered from others within the debtors' organization, my review of relevant documents, or my opinion based upon my experience concerning the debtors' operations.

## I.

## THE DECLARANT

2.     The debtors and debtors-in-possession in the related bankruptcy cases herein (collectively, the "Cases") are as follows: Hi-Five Enterprises, LLC, a California limited liability company ("Hi-Five"), One South Lake Street, LLC, a Nevada limited liability company ("One

South"), and Wild Game Ng, LLC, a Nevada limited liability company, doing business as: The Siena Hotel Spa & Casino ("Wild Game", and collectively with Hi-Five and One South, the "Debtors").

3. I am the managing member of each of the Debtors and have served in this capacity since May 8, 1998. I am authorized to speak on behalf of the Debtors in these proceedings.

4. As the managing member of the Debtors, I oversee and direct all of the Debtors' financial planning, financial reporting, and cash management activities, and I have been actively involved in developing and implementing the Debtors' business strategies. I have also been serving—and will continue to serve—as the point person for the Debtors' efforts in these Cases. As the managing member of the Debtors, I have worked extensively with the books and records of the Company, including its financial statements and projections, business plans, business analyses and reports, lease obligations, contracts and other legal documents, notes and correspondence, and the like. On a regular basis, I have witnessed and/or participated in negotiations with lenders, vendors, and customers of the Debtors, and I have worked closely with personnel from the Debtors' development, marketing, retailing, and sales operations in order to oversee all aspects of the Debtors' business and coordinate its financial affairs. Based on all of the foregoing, I have developed an intimate familiarity over the past 10 years with the Debtors' books and records, its business and financial history, its operations, and its current business and financial situation, and with the casino and hotel industry in Reno, Nevada generally.

5. The Debtors filed their respective bankruptcy cases on July 22, 2010. Their respective bankruptcy case numbers are: Hi-Five, as captioned above, One South, case no. 4:10-bk-48270, and Wild Game, case no. 4:10-bk-48272. I submit this declaration in support of the relief that the Debtors have requested in the various "first-day" motions that have been filed in these Cases, and to assist the Court and interested parties in understanding the circumstances that led to the commencement of these Cases. I have reviewed the first-day motions, and I believe that the relief sought therein will enable the Debtors to continue to operate effectively during its transition to chapter 11, thereby avoiding or minimizing certain adverse operational and financial consequences that might otherwise result from the commencement of these Cases, and that the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions - 2 - CASE NO. 4:10-BK-48268-RJN
LA/303174.1
Case: 10-48268    Doc# 10    Filed: 07/26/10    Entered: 07/26/10 19:06:25    Page 2 of 19

relief sought in the various first-day motions are essential to ensuring the uninterrupted operation of the Debtors' business and the success of these Cases.

## II.

## THE COMPANY

### A. Business Segments And Operations.

#### ONE SOUTH

6. One South was formed for the purpose of owning and leasing improved real property in Reno, Nevada commonly known as The Siena Hotel Spa & Casino and the adjacent parking lot property and expansion property (the "Property"). The Property is leased to Wild Game. I am the sole manager of One South. Hi-Five holds a twenty-five percent (25%) equity interest in One South.

7. In connection with the acquisition of the Property, on or about August 22, 2001, One South and the Lender entered into a *Promissory Note Secured by Deed of Trust* (the "Acquisition Loan") in the principal amount of $50 million, thereby consolidating a number of prior loans that the Debtors had entered into with the Lender. The Acquisition Loan was originally due and payable on January 1, 2007; however, One South obtained a five-year extension of the original maturity date. The Acquisition Loan is secured by a security interest in the Property pursuant to the Deed of Trust, which was recorded on December 17, 2001, under instrument number 2629346, in the office of the County Recorder of Washoe County, Nevada (the "Security Agreement"). A UCC-1 affecting only the Property only may have been recorded as well.

#### WILD GAME

8. Wild Game operates The Siena Hotel Spa & Casino ("Siena") located in Reno, Nevada which opened on July 31, 2001. Siena is a boutique hotel featuring 185 rooms and 29 suites that range in size up to 1,200 square feet. The hotel also has a convention, meeting and banquet space as well as various bars and restaurants and a spa located on the premises. The casino is 23,000 square feet and boasts all the latest equipment of a modern-day gaming complex. The casino owns approximately 243 slot machines, 28 gaming tables, and a poker room, as well as

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions - 3 - CASE NO. 4:10-BK-48268-RJN

LA/303174.1

Case: 10-48268   Doc# 10   Filed: 07/26/10   Entered: 07/26/10 19:06:25   Page 3 of 19

a race and sports book. Siena is one of the only boutique hotel spa casinos in Reno and therefore, is not in direct competition with any of the other properties in Reno. As of the Petition Date, the Debtors had approximately 332 employees.

9. Siena's spa is an important feature that attracts both local customers and guests of the resort and adjacent resorts. The Spa boasts eleven therapy rooms offering a number of treatments and a mediation center. The spa is integrated into the adjacent pool and outdoor recreation area which also provides food and beverage services to its guests.

10. Siena's casino marketing is directed at both the mid-level stakes gaming customers (customers that wager less on average) as well as high stakes customers (customers that wager more than average). The mid-level stakes gaming customers tend to provide the Debtors with a less volatile, more consistent gaming revenue stream. This revenue also is the base line for the non-convention, non-tourism and non-weekend traffic. Marketing to this customer base is intended to drive traffic consistently on the "off" days and such promotions tend to be geared to such days. As the gaming market in Reno, and elsewhere, has declined, a greater focus has been placed on these consistent players. Consistent with its focus on mid-level stakes gaming customers, Siena has the ability to offer table games designed for such a market, implement stricter credit policies, and emphasizes slot machine play. Siena's strategy is to continue to invest in its slot machines and table game products, market to its customer base primarily through a multi-tiered players' club program called the River Card loyalty program, and to offer slot machine and poker tournaments and other special events and promotions.

11. The Debtors focus capital expenditures for Siena toward maintaining the hotel rooms and amenities in pristine condition to compete for customers with the other hotels and casinos in Reno, Nevada. Room rental rates, slot revenues and the use of the convention and banquet spaces are the primary factors driving operating margins. Gaming is the single area where a modification of win per unit does not require a modification of the cost of operations and payroll.

12. The Debtors use various technologies to maintain labor costs at a reasonable level, including kiosks for hotel check-in, slot club activities, and slot ticket redemption.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions - 4 - CASE NO. 4:10-BK-48268-RJN
LA/303174.1
Case: 10-48268　Doc# 10　Filed: 07/26/10　Entered: 07/26/10 19:06:25　Page 4 of 19

### HI-FIVE

13. Hi-Five was originally created to allow investors that were interested in investing in the acquisition of Siena to use it as such an investment vehicle. Hi-Five has a 25% membership interest in One South, its affiliate, and therefore an interest in the Property. Hi-Five is located in this District and has become the "nerve center" for the Debtors' businesses; furthermore, the insiders of the Debtors, the secured creditor of One South, and what appears to be a majority of unsecured creditors and interested parties either live or do business in this District.

**B.    The Recession and Events Leading to These Chapter 11 Filings.**

14. Although the Siena has historically not been a very profitable business, in recent months it commenced a restructuring effort that has produced significant positive results. The Debtors' Chapter 11 filings are designed to further these positive results and to facilitate a comprehensive restructuring and reorganization for the Debtors.

15. For the first 8 years, I personally loaned the Debtors' moneys to pay the rent and the Acquisition Loan. The Debtors total gross annual revenue in 2006 was $26,358,958.78 and increased in 2007 to $26,507,984.30. However, commencing in 2008, the Debtors total gross annual revenue began to sharply decline to $22,587,090.67 in 2008 and to $18,579,278.75 in 2009. The Debtors' total net annual income was a loss of $4,385,569.63 in 2006 and further decreased to $6,051,976.09 in 2007 and $6,661,108.05 in 2008 and $6,699,065.01 in 2009. However, I believe that the Debtors can become a profitable entity shortly with the appropriate "right sizing" of the Debtors through these Cases.

16. The Indian gaming in Sacramento, California, which opened in or about June 2004, had an almost overnight effect on Siena and the Debtors. There was a sudden (and continues to be) drop in tourism, the cancellation of major conventions and festivals as well as cancellation of a number of corporate seminars and events. Moreover, the Nevada Gaming Commission (the "Gaming Commission"), in an effort to protect casino customers, requires all gaming establishments in Nevada to maintain a "minimum bankroll" which is a report providing current cash on hand and cash going forward. This includes a formula to determine the amount that must be kept liquid at all times. The numbers and associated formula are generally

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions     - 5 -     CASE NO. 4:10-BK-48268-RJN
LA/303174.1

Case: 10-48268    Doc# 10    Filed: 07/26/10    Entered: 07/26/10 19:06:25    Page 5 of 19

determined on a yearly basis. In addition, gaming taxes are paid in advance based on such forecasts. With the drastic hit on gaming and the resort in general, and with cashflow remaining tight, the Siena had difficulty maintaining its minimum bankroll over an extended period of time.

17. Upon my formal request, the Gaming Commission provided a modification of the Siena's minimum bankroll requirements but the sudden and immediate hardship associated with the Indian gaming in Sacramento, global recession and decline in gaming and tourism, combined with the built in costs of operation, led our minimum bankroll to not be met on multiple occasions towards the end of 2009 and the end of the first quarter of 2010. This caused investigations and audits by the Gaming Commission. Additionally, the need to settle historic debt accumulation during this decline caused a delinquency in our tax prepayments. Accordingly, a hearing was called by the Gaming Commission to determine by statute if our license was deemed surrendered. At the hearing, the Gaming Commission also conducted an analysis into our ability as a business to manage our day to day obligations including trade payables, employees and gaming customers. The hearing suspended our license but stayed enforcement for 30 days in order to allow the Debtors an opportunity to bring their tax payments current and to address their other operational issues.

18. During this time, I explored numerous options and secured a term sheet proposal for potential DIP financing. However, at the follow up hearing on July 22, 2010, with these Cases already having been filed, the Gaming Commission turned the case over to the Nevada attorney general to oversee and ensure our continued gaming compliance. It remains the case that, upon payment of the delinquent gaming taxes in the amount of approximately roughly $193,000 (which delinquencies were the original cause for the complaint by the Gaming Commission), Wild Game's license will be permanently reinstated. The Debtors intend to promptly pay these taxes once the Debtors' cash collateral usage motion is approved by this Court. These issues with the Gaming Commission combined with the overall economic recession which has hit Reno, Nevada particularly hard given its reliance on tourism and construction, has attributed to a serious decline in the Debtors' revenue in 2008 and 2009.

19. More specifically, the Debtors' casino revenues in 2009 was $9.5 million, a

Arent Fox LLP
Attorneys At Law
Los Angeles

Declaration Re First Day Motions - 6 - CASE NO. 4:10-BK-48268-RJN
LA/303174.1
Case: 10-48268   Doc# 10   Filed: 07/26/10   Entered: 07/26/10 19:06:25   Page 6 of 19

decrease of $2.1 million from 2008. Casino revenues are comprised primarily of slot machine and table game revenues. Slot machine and table game revenues decreased primarily due to less wagering as a result of the slower economy, reduced hotel occupancy and less walk-in business.

20. Siena's room revenue in 2009 was $3.4 million, a decrease of $800,000 from 2008. Its revenues through the second quarter of 2010 is $1.7 million, a decrease of about $900,000 from the same time last period 2009.

21. All said, the Debtors generated a loss from operations of $6.7 million in 2009.

22. The Debtors were unable to meet their obligations under the Acquisition Loan and accordingly, the Lender filed a notice of default on December 11, 2009, thereby exacerbating Siena's difficulties. A notice of trustee's sale was never recorded. To date, however, the Lender has not recorded the requirement notice of trustees sale. That combined with Gaming Commission threatening to pull the Debtors' license on July 22, 2010 made it apparent to me that the Debtors would not be able to weather the continuing economic recession and its outstanding current liabilities without strengthening its financial capital position and taking appropriate measures afforded under Chapter 11 of Title 11 of the United States Code.

23. In November of 2009, I started inquiring into a number of companies who focused on turnaround, workout and other insolvency positioning to help restructure the Debtors. In December 2009, I contracted with OneSite Consulting, Inc., a hotel management and consulting firm, to undertake a concurrent audit and restructuring of the Siena and determine an appropriate repositioning strategy. Onsite recommended and the Debtors made, significant operational changes to the customer marketing program and third party hotel booking systems (i.e., Expedia, etc.) that brought the Debtors overall revenue to be one of the highest in Reno. With this restructuring, the hotel, food and beverage and spa and other add-value services, which once had been considered a loss or secondary to gaming, now enjoy revenues and margins that matched or in some instances, surpassed gaming.

24. The Debtors have achieved significant positive results from the repositioning strategy. The Debtors closed a $600,000 contract with United Airlines flight staff union and the Debtors now have a strong wedding base providing over $28,000 per event. Siena is also seeing a

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions - 7 - CASE NO. 4:10-BK-48268-RJN

LA/303174.1

Case: 10-48268    Doc# 10    Filed: 07/26/10    Entered: 07/26/10 19:06:25    Page 7 of 19

consistent resurgence in sales. In all, while the top line volume has decreased, the Debtors' profit margins have increased and I firmly believe that an appropriate "right sizing" of the Debtors will allow the Debtors to achieve a positive cash flow shortly and will allow the Debtors to seek new investor, operational, and financing sources, for the benefit of creditors and equity holders.

25. To implement its reorganization strategy, on July 21, 2009, the Debtors filed voluntary petitions for relief under the Bankruptcy Code. The Debtors are continuing to operate their business and manage their affairs as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. I am working with the Debtors' management team, its legal advisors, and its financial advisors rapidly to finalize a reorganization plan. I believe that the Debtors can emerge from Chapter 11 as a strong, recapitalized, and profitable business.

## III.

## THE CONSOLIDATED BALANCE SHEET

### A. The Debtors' Assets.

26. Based on the Debtors' books and records, as of December 31, 2009, the Debtors' unaudited balance-sheet assets totaled approximately $5.08 million. Of this amount, the Debtors held, on a book value basis, approximately $322,674 in net inventories; fixed assets (including property and equipment) of $2,207,940, net of depreciation; $453,000 in net accounts receivable; $2,062,941in cash; and other assets totaling approximately $40,000. While the Debtors have not yet closed its books for July 2010, I estimate that the total assets as of that date, and July 21, 2010 (the "Petition Date"), will be approximately $3.8 million (not accounting for valuable litigation rights).

### B. The Debtors' Liabilities.

27. Based on its books and records, as of June 30, 2010, the Debtors' unaudited, balance-sheet liabilities totaled approximately $20.7 million. This amount includes approximately $7.6 million in trade debts; $196,000 in taxes; $12.5 million in accrued expenses and other current liabilities. Although the Debtors have not yet closed their books for July 2010, I estimate that the total liabilities as of that date, and the Petition Date, will be approximately $23.3 million. Some of the Debtors' more significant liabilities are described in more detail, herein. Naturally, the

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions        - 8 -        CASE NO. 4:10-BK-48268-RJN

LA/303174.1

Case: 10-48268    Doc# 10    Filed: 07/26/10    Entered: 07/26/10 19:06:25    Page 8 of 19

Debtors' bankruptcy schedules and statement of financial affairs will have a more detailed and itemized list of assets and liabilities.

## IV.

## EMERGENCY MOTIONS

28. I believe strongly that the Debtors will suffer severe and irreparable harm if they do not promptly obtain the relief requested in its emergency, "first-day" motions. It is critical that the Debtors maintain strong relationships with their customers, employees, partners, vendors, creditors, gaming regulators and other governmental entities, and such other parties that enable the Debtors to conduct business. The facts and circumstances relating to the relief requested in these motions, and the urgency of that relief, are set forth in the following sections.

## V.

## CASH COLLATERAL

29. The Debtors have an emergency need for use of the Cash Collateral in accordance with the budget (the "Budget") attached to the Cash Collateral Motion as Exhibit "A" and I respectfully request Court authorize the Debtors on an emergency interim basis for such use in order to avert an immediate closure of its businesses. The Budget was formulated after review of the Debtors' normal and ordinary course cash needs in the operation of its businesses. The usage of the Cash Collateral in accordance with the Budget is in the best interests of the Debtors and their estates.

30. I believe that the enterprise value of the Debtors' businesses will not diminish provided the Debtors' businesses continue to operate in the ordinary course, the Debtors are permitted to make the reasonable expenditures as proposed in the Budget and all gaming licenses and permits and present management remain in place.

31. An integral aspect of maintaining the Debtors' relationships, compliance with applicable gaming laws and regulations, and their business operations is the Debtors' ability to use the Cash Collateral to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to their employees, customer programs, vendors, and taxing authorities,

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions    - 9 -    CASE NO. 4:10-BK-48268-RJN

LA/303174.1

Case: 10-48268   Doc# 10   Filed: 07/26/10   Entered: 07/26/10 19:06:25   Page 9 of 19

to pay for necessary ordinary course property maintenance and projects and to maintain minimum bankroll requirements as determined by the Gaming Commission.

32. My bankruptcy counsel and I have discussed their Chapter 11 filing with Lender, and I believe that the Lender and the Debtors will ultimately be able to reach a consensual agreement with respect to the use of cash collateral—to the extent that Lender may have a valid, perfected security interest in the Debtors' cash—or alternatively, that Lender may have no objection to the Cash Collateral Motion, given the emergency nature of these filings there was not sufficient time for the parties to negotiate a cash collateral stipulation.

33. With respect to One South, that entity generates no cash other than income provided by Wild Game pursuant to its operating agreement with One South. Wild Game's Budget projects that no such payments will be provided to One South during the Budget Period, and One South will make no payments or otherwise use cash assets pursuant to the Budget. As such, to the extent that the Lender may have a valid, perfected, unavoidable security interest in cash held by One South, the Cash Collateral Motion and the Budget do not contemplate that any such cash will be utilized by the Debtors.

34. With respect to Wild Game, the Lender appears to have no security interest whatsoever in that debtor's assets. I believe that the Equipment Lessors may have security interests in certain of the Debtors' equipment and lighting fixtures, but with certain limited exceptions, such interests do not appear to extend to the Debtors' cash.

35. The Debtors have already reduced and will continue with its efforts to reduce further its operating expenses as much as possible. Furthermore, the Debtors are also seeking to obtain post-petition financing which will provide additional liquidity for the Debtors' operation.

36. Finally, Wild Game, which operates The Siena, is not a party to any loan agreement or credit facility that appears to encumber its cash assets. Eight entities have filed UCC-1 financing statements with respect to various gaming equipment and lighting fixtures located at The Siena: IGT, Konami Gaming, Inc., Raymond Leasing Corp., Young Electric Sign Company, PDS Gaming Corporation, PDS Gaming Corporation – Nevada, Bank of Wyoming, and PDS Funding 2004-A, LLC. The Debtors have not yet determined whether the underlying

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions - 10 - CASE NO. 4:10-BK-48268-RJN

LA/303174.1

Case: 10-48268  Doc# 10  Filed: 07/26/10  Entered: 07/26/10 19:06:25  Page 10 of 19

agreements with these parties are properly characterized as leases or financing agreements, but in any event, the security interests asserted appear to pertain to the Wild Game's leased equipment and not the cash generated by the Wild Game's operations. The Equipment Lessors will be provided notice of the Cash Collateral Motion and any hearing thereto.

## VI.

## JOINT ADMINISTRATION

37. The Emergency Motion for an Order Directing Joint Administration of Related Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015(B) and Local Bankruptcy Rule 1015-1(B) (the "Joint Administration Motion") requests that the Court enter an order directing joint administration of the three Chapter 11 cases filed by each of the Debtors' entities. As set forth above, each of these entities has commenced a Chapter 11 case that is pending before this Court, and all have joined in the request for joint administration. By definition, the companies are all closely related affiliates and they share common management and ultimate ownership. Additionally, there is substantial overlap in their creditor bodies.

38. I believe that jointly administering these estates will eliminate unnecessary and expensive duplication of effort by the three companies, their professionals, their creditors, parties in interest, and this Court. Moreover, I believe that unless the Court promptly grants the request for joint administration, these estates and their creditors will be saddled with expensive and unnecessary administrative expenses. I also believe that joint administration will greatly reduce the costs of administering these Cases and will eliminate the substantial confusion and waste that would otherwise be created by maintaining separate dockets. Almost without exception, the only material differences between each set of pleadings that will be filed in these Cases will be in the captions. Substantive matters affecting one estate typically will affect the other. I therefore believe that requiring the Debtors to file separate pleadings in each case will entail considerable duplication at substantial cost, and I do not believe that this duplication will generate any additional benefit to creditors.

39. Finally, I believe that filing separate pleadings in all three Cases would significantly burden the Clerk's office, which must process and store the pleadings that may be

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions - 11 - CASE NO. 4:10-BK-48268-RJN

LA/303174.1

Case: 10-48268    Doc# 10    Filed: 07/26/10    Entered: 07/26/10 19:06:25    Page 11 of 19

filed in these cases. Similarly, I believe that the Debtors' creditors will also be burdened by separate administration. Creditors would be required to file duplicate copies of pleadings in both cases for no reason other than to maintain separate dockets and files. By jointly administering the estates, creditors will receive notice of all matters involving all entities, thereby ensuring that they are fully informed of all matters potentially affecting their claims.

40. I therefore believe that the proposed joint administration of these Cases should be authorized on an expedited basis, since the earlier the Debtors can implement these streamlined procedures the greater the benefit and savings will be to its estates, its creditors, and this Court.

## VII.

## CUSTOMER DEPOSIT MOTION

41. As of the Petition Date, the Debtors had hotel room reservation deposits for post-petition dates. Numerous prospective guests and other customers had placed deposits for hotel rooms they intended to occupy or facilities they intended to use. In addition, some of these hotel room reservations had been placed by travel agencies, which pursuant to commission agreements, are entitled to receive commissions when such sites are occupied and the customers pay their bills. The Debtors request that the Court enter an order permitting them without further order of the Court to honor all prepetition Customer Deposits and Travel Agent Commissions.

42. Maintaining the satisfaction and goodwill of prospective guests and other customers is imperative to the success of any reorganization by the Debtors. If the Debtors are unable to honor advance deposits for hotel room reservations, their operations will be severely affected.

43. Likewise, travel agents will be unlikely to direct their future customers to the Debtors if prepetition deposits and commission agreements are not honored. This would have a substantial chilling effect on the Debtors' reorganization and business. Consequently, maintaining the satisfaction and confidence of travel agents is imperative to the Debtors' ongoing business operations and the success of any reorganization by the Debtors.

44. As of the Petition Date, the Debtors estimate that they are holding Customer Deposits and Travel Agent Commissions payable to Siena in the amount of $24,415.88, which

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

Declaration Re First Day Motions - 12 - CASE NO. 4:10-BK-48268-RJN

LA/303174.1

Case: 10-48268  Doc# 10  Filed: 07/26/10  Entered: 07/26/10 19:06:25  Page 12 of 19

sums are related to the hotel, spa and casino located at the property. With respect to One South and Hi-Five, which operations do not include a hotel, casino or spa, the Debtors hold no Customer Deposits or Travel Agent Commissions.

45. The Debtors have sufficient cash on hand to honor all of the foregoing obligations for Customer Deposits and payable Travel Agent Commissions. The Debtors' operations are currently cash flow positive, prior to debt service, and the Debtors presently have approximately $312,244.00 either in cash or in their bank accounts or on hand as of the Petition Date.

46. The relief requested in the Customer Deposit Motion is in the best interests of the Debtors' estates, as it will have little, if any, economic impact on the Debtors' creditors, while preserving for the creditors invaluable goodwill and travel agent confidence. It is necessary that this Court grant the relief requested in the Customer Deposit Motion to facilitate continued operation of the Debtors' business. The importance of the Debtors' customer loyalty and the need to encourage travel agents to continue booking business for customers is critical.

## VIII.

## CASINO CHIPS MOTION

47. As Debtors derive a significant portion of their revenue from their casino operations, it would be extremely detrimental to the Debtors' casino operations, and therefore, to their overall results of operation if they are required to distinguish between pre and post-Petition Date gaming liability and related types of liability.

48. Most critically, the Debtors' failure to honor all of its Gaming Liabilities would jeopardize the Debtors' gaming licenses without which the Debtors' casino operations would cease entirely depriving the Debtors of any potential revenue generating opportunity from that aspect of their business.

49. In this regard, as of the moment of the filing of the Debtors' petitions, the Gaming Liabilities include:

50. Prepetition casino chips and tokens in the public domain for Wild Game in the total estimated amount of $73,034.00.

51. Progressive slot liability on various gaming devices through the casinos, which

of the Debtors' total pre-petition debts, yet their satisfaction will contribute significantly to the Debtors' revenue-generating ability and toward fostering customer goodwill. Furthermore, without the requested relief, the Debtors' gaming operations will be disrupted gravely and the Debtors needlessly will be forced to incur significant expenses implementing a means of distinguishing between pre and post-Petition Date casino chips, tokens, wagers, progressive slot liabilities, deposits and customer promotion accumulations and similar customer promotions.

57. If the Debtors are prohibited from honoring and maintaining all casino chips, tokens and wagers in existence of the Petition Date, progressive slot liabilities and deposits, and all pre-petition customer promotion accumulations and similar customer promotions, consistent with their past business practices, then customer's lost confidence will damage the Debtors' businesses to an extent that far exceeds the costs associated with honoring and continuing such practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of July, 2010, at Lafayette, California.

_____
BARNEY NG

| In re: **Hi-Five Enterprises, LLC** | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 4:10-bk-48268 |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
Arent Fox LLP, Gas Company Tower, 555 West Fifth Street, 48th Floor, Los Angeles, CA 90013.

A true and correct copy of the foregoing document described <u>OMNIBUS DECLARATION OF BARNEY NG IN SUPPORT OF DEBTORS AND DEBTORS-IN-POSSESSION'S "FIRST DAY MOTIONS"</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>July 26, 2010</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. <u>SERVED BY U.S. MAIL OR OVERNIGHT MAIL</u>**(indicate method for each person or entity served)**:**
On <u>July 26, 2010</u> I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**III. <u>SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL</u>** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 26, 2010 | SIMONA FILIP | /s/ Simona Filip |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

| In re: **Hi-Five Enterprises, LLC** | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 4:10-bk-48268 |

ADDITIONAL SERVICE INFORMATION

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF") :**

Office of the U.S. Trustee/Oak
USTPRegion17.OA.ECF@usdoj.gov, ltroxas@hotmail.com


**II. SERVED BY U.S. MAIL:**

Office of the U.S. Trustee/Oak
1301 Clay St. #690N
Oakland, CA 94612

20 LARGEST CREDITORS OF HI-FIVE ENTERPRISES, LLC:

Barney Ng
201 Lafayette Circle 2nd Fl
Lafayette, CA 94549-0000

20 LARGEST CREDITORS OF ONE SOUTH LAKE STREET, LLC:

RE Reno LLC
201 Lafayette Circle 2nd Fl
Lafayette, CA 94549

Attorneys for RE Reno LLC
Jeffrey C. Krause
Eve H. Karasik
Eric D. Goldberg
Stutman Treister & Glatt
1901 Ave of the Stars, 12 Fl
Los Angeles, CA 90067

20 LARGEST CREDITORS OF WILD GAME NG, LLC :

ARISTOCRAT/COFACE COLLECTION
PO Box 8510
Metairie, LA 70011-8510

ATRONIC AMERICAS LLC
PO Box 49008
San Jose, CA 95161

BAKEMARK
5455 Louie Lane
Reno, NV 89511

BALLY TECHNOLOGIES INC
Lockbox 749335
Los Angeles, CA 90074

BARNEY NG
201 Lafayette Circle 2nd Fl
Lafayette, CA 94549

CITY OF RENO
Business License Renewals
PO Box 7
Reno, NV 89505

COSTCO
2200 Harvard Way
Reno, NV 89502

DE LAGE LANDEN FINANCIAL SERV
REF NO 000000000379545
PO Box 41601
Philadelphia, PA 19101-1601

GRANT THORNTON LLP
PO Box 51552
Los Angeles, CA 90051-5852

IGT
9295 PROTOTYPE DR
ATTN Linda Rocconi-Credit Dpt
Reno, NV 89521

KONAMI GAMING INC
Lockbox Address
Dept 8401
Los Angeles, CA 90084-8401

LATHROP & GAGE LLP
1888 Century Park E., Ste 1000
Los Angeles, CA 90067

NV ENERGY
FINANCE - A/P
6226 W Sahara Ave Ms11
Las Vegas, NV 89151

PALTRONICS INC
1145 Paltronics Court
Crystal Lake, IL 60014

RENO-SPARKS CONV and VISITOR-WL
Finance Department
PO BOX 837
Reno, NV 89504-0837

SAM S CLUB/ GE MONEY BANK
13809 Research Blvd Suite 800
Austin, TX 78750

SPILLANE SHAEFFER ARONOFF and BANDLOW LLP
1888 Century Park E., Ste 1000
Los Angeles, CA 90067

SYSCO FOOD SERVICE OF SACRAMENTO
PO Box 138007
Sacramento, CA 95813

U1 GAMING
55 TIMBERLINE DRIVE
SUITE 6
Bozeman, MT 59718

WALTER NG
201 Lafayette Circle 2nd Fl
Lafayette, CA 94549

SECURED CREDITORS OF WILD GAME NG, LLC :

IGT
9295 PROTOTYPE DR
Reno, NV 89521

KONAMI GAMING, INC.
585 Trade Center Drive
Las Vegas, NV 89118

| In re: **Hi-Five Enterprises, LLC** | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER 4:10-bk-48268 |

RAYMOND LEASING CORPORATION
P.O. Box 130
Greene, NY 13778

PDS GAMING CORPORATION-NEVADA
6280 Annie Oakley Drive
Las Vegas, NV 89120-391

WELLS FARGO BANK, NATIONAL ASSOCIATION
3800 Howard Hughes Parkway 4th Floor
Las Vegas, NV 89109

YOUNG ELECTRIC SIGN COMPANY
775 E Glendale Ave
Sparks, NV 89431

BANK WYOMING
435 Arapahoe
Thermopolis, WY 82443-1232